Good morning. May it please the Court. Andrew Kilberg, on behalf of the petitioners and the television affiliate interveners. This case is about the future of our country's broadcast industry. When Congress passed the Telecommunications Act in 1996, the vast majority of Americans did not even have dial-up Internet. Now, 30 years later, consumers can access a huge variety of content, video and audio content, at the push of a button. On your drive home from the courthouse, you are no longer limited to the radio or cassette tape. Instead, you can choose from millions of songs, podcasts and audiobooks on Spotify, Pandora, Apple Music or Audible. And once you're home, you can turn on your local news broadcast news, catch a game on ESPN through your cable subscription or watch Netflix or YouTube. Broadcasters today are struggling to survive against this onslaught of new competition. As the current FCC Chairman has said, this is a, quote, break-glass moment for broadcasters, end quote. Section 202H was meant to address this exact situation by providing relief from the FCC's restrictive ownership rules. But in the order on review, the Commission ignored that mandate. The Commission could not find a single aspect of the rules to loosen and even tightened one rule. The Commission was only able to get to that result by irrationally defining the relevant markets in a way that permanently excludes from its analysis all of these new sources of competition. Even that action came grudgingly. We had to file a petition for mandamus to get the Commission to finish this 2018 quadrennial by 2024. The order violates Section 202H and the APA several times over. The time for relief is now. Broadcasters have been waiting long enough. I welcome the Court's questions. Do you see the Commission's job to protect broadcasters? I think the Commission's job is to protect the public interest and, in particular, under the 202H analysis as the result of competition. After reviewing the competitive landscape as it's changed, I think it has changed dramatically, Judge Benton, in the 30 years since the Telecommunications Act was passed. Prometheus. It shows a lot of deference, and this is the Court in 21 unanimously. The Supreme Court gives a lot of deference to the FCC. It has deference written throughout here. I don't have to quote it to you. I'm sure you're familiar with it. Why doesn't that say that at least as to everything but 11, it's just a matter of deference to the agency, substantial deference, the words the Supreme Court says in Prometheus. Why doesn't that rule this case? Your Honor, I don't think that Prometheus changed bedrock APA case law, which shows that, yes, agencies will get deference to their decisions if they are reasonable and explained. Here, I think that the Commission, by excluding competition from outside of broadcasting, violated both the statute and the APA, and that was an unreasonable approach. Secondly, in completely ignoring some very important record evidence studies that were put into the record by broadcasting from very reputable organizations, empirical studies, or in inciting them, giving them very short shrift, I think that is also separately a violation of the APA. You're never going to get to deference if the administration doesn't do its job reasonably in the first instance. What are the existing rules under 202H? Is it each quadrennial, or is it the statute as passed in 1996? How should we look at that? The rules under, as how 202H works, Your Honor, or the... Well, the term existing rules in 202H. How are we supposed to apply that? I believe that the only two rules that are still subject to the quadrennial review are the two that are under review here, the local TV rule and the local radio rule. How 202H works is it's a two-step process. The first step is the Commission needs to evaluate each of its rules, determine whether they are still necessary in the public interest as a result of competition. Only if the answer to that is no do they ever get to the second step. For example, to take Note 11, the Commission should never have gotten to the second step. In their view, Note 11, the original, was still necessary. It was still doing work that was important. It should never have even gotten to the second question of whether it should have tightened it or not. We can see this as the D.C. Circuit in 2002 named it a deregulatory presumption. I think that also is demonstrated by the rest of Section 202. Judge Grunder, the Congress ran through in a series of subsections instructions to the Commission to loosen various ownership rules. Then in 202H it said, now keep that process going. I love the quote from Judge Dugginsburg in the Fox television station's case from 2002 saying this is not supposed to be a wait and see approach. It's more like a dam the torpedoes full speed ahead. But unfortunately we've seen over the years that it's taken much too long for broadcasters to get the relief they need. So your position would be that the term existing rules in 202H would be not necessarily to go back to the 1996 statute, but look at each quadrennial change and it should loosen each time thereafter, right? Yes, Your Honor. Yes. And I believe that's how both the D.C. Circuit, the Third Circuit and the Commission itself has understood this. It's intended to look at the rules as they exist at the time of each review. And I think Justice Kavanaugh's decision in Prometheus recognized this as well, saying that it was supposed to keep pace with competitive change. The courts have been, I think, uniform on that point in particular. I do also want to emphasize something with respect to the top four prohibition, which is under the core aspect of the local TV rule. This rule historically, and I think the Commission recognized this and relied on the same justification in the order under review, said this is a competition-based rule, meaning that the purpose was to enhance competition in these markets. Yet the record evidence that's now here in this quadrennial showed that the historic justification for where to draw that line at the top four stations no longer exists. The Commission had previously cited a purported drop in ratings, a gap in ratings between the top four stations and the fifth, showing that the top four are kind of market dominators. We put in evidence in the record demonstrating that's no longer the case if it ever was. Two-thirds of markets across the country, local geographic areas, the largest gap in ratings and in revenue is among the top four. So that historic justification is just no longer there to support this rule as a competition. I mean, that applies in all markets, like ones where there are two or three stations, small markets, short markets you call them, I think, where there are two or three stations and one of them has, I don't know, 60 or 70 percent, and it's just a giant in the market. That rule, top four still applies? Yes, the top four rule. Two and three can't get together. Correct. Two and three can't get together there. I think, Judge Benton, there's a good example I would take from Judge Shepard's hometown that shows how the top four prohibition is preventing effective competition, which is the – and this is in the record in the BIA TV study, which the commission did not cite by name and I don't think discussed directly in any way in the order – that the top rated station has more than double the combined market share of the number three and number four. It's true in my hometown, too. So the number three and number four come together. That's where I was born and grew up. But anyhow, not to question your research, but it applies there. Now, they say they're going to do case-by-case in those markets? They're not doing a case-by-case. Well, they say they're going to. I see that on many pages of their briefs. Help me. It's an – so the way that the local TV rule works is it's an ex-ante prohibition. And yes, there is a waiver from the top four prohibition that the commission put in place I think eight years ago. But I think that APA case law is clear that a waiver process and exception cannot justify a rule that's irrational on the front end. I'd also note that, you know, it's not like there would be absolutely the Wild West with respect to mergers and acquisitions here. Every single application for a license, including to transfer a license, has to be approved by the FCC under Section 309 and 310, depending on the exact type of transaction it is. And there, the public interest, necessity, and convenience must be addressed. So if there is concern about a particular transaction, that's where the FCC should address it. And I think also this point, Judge Benton, demonstrates the – I think the irrationality of the FCC's reasoning. I think it's paragraph 86 of the order. They say, well, you know, in some instances it may not be the case that the top four are the kind of dominant in a market. But that doesn't mean that categorically we should allow combinations among the top four in the other markets. The problem is that's not their burden. Their burden is to demonstrate that, at least in the majority of markets, this rule makes sense. And they just have not, I think, met that burden. Under Section 202H, what does the word competition mean? Thank you, Judge Benton. No one really – I don't think anybody really got into that in the briefing. I think the word competition is not constrained. So there's no adjective. It's not limited, I think, to broadcasters. But I think it is intended as the result of competition, as a reflection of Congress' judgment, that the media marketplace was rapidly changing in 1996. That has only accelerated in the last 30 years. But in terms of the statutory meaning of competition, it's not merely antitrust principles. It's to look at the competitive environment within different media types. And to compare Judge Shepard to Section 11 of the Communications Act, which is 47 U.S.C. 161, it's a somewhat similar statutory construct where the FCC has to review certain rules every two years. There, Congress referred to economic competition in the particular type of service, meaning within cable, or if it would apply to broadcasting, within broadcasting. Here, in Section 202H, Congress did not put an adjective or an adverb or whatever to modify competition. Well, they do in the purpose, though, say promote competition. What competition did they mean to promote? And the next words are, and reduce regulation. You know what I'm referring to, right? I believe that's... That's the beginning of the Act, the preamble, adopted by Congress as the purpose of the Act. Yeah, yes, yes. It says promote competition. Yes, Judge Benton. I think the intent there is to promote competition, but not just among broadcasters. Again, the Telecommunications Act dealt with much more than broadcasting. And in 1996, again, the historical context refer... In the historical context in 1996, you have cable establishing itself very strongly. Satellite is taking off. Cable had been around for 20 years before that, though, Counsel. Go ahead. And their subscriber base was increasing. Satellite had been around for a while. It was getting a foothold. The Internet was around the corner. As I said, most Americans did not have dial-up. But Congress is legislating within that environment, in that context. And especially, in particular, with Section 202H having run down through a series of directions to move in the direction of deregulation, I think it would be odd to say that competition was only supposed to look at just radio or just TV and not even look at the two of them together. That is the final test public interest. You know how it ends, to be no longer in the public interest. Is public interest the final test? I think that by putting competition in 202H as the result of competition, it makes competition front and center in analyzing whether the public interest is still served. And also, competition has historically been one of those public interest factors, Judge Benton. Could we use a dictionary definition of competition? I'm sure that the dictionary definition of competition... Well, here's one. Black's Law Dictionary says it's the struggle for commercial advantage or the effort or action of two or more commercial interests to obtain the same business from third parties. I think that that certainly is one piece of textual evidence to look to, Judge Shepard. And I think that that actually supports our position here, which is that, as I think my opening demonstrated, the reality, the common sense here is that broadcasters are competing with cable, with digital streaming platforms, with YouTube for people's eyeballs and ears. And that's just the reality of today. You see that only in the Commission's own 2022 Communications Marketplace Report, only 15% of American households use over-the-air television at all, whereas at that time, nearly double that, 27% of American households had completely cut the cord and only rely on digital streaming. The difference is shown again in the BIA TV report that between digital usage and broadcast TV usage among age groups is dramatic, showing that this is a trend that is continuing. And when it comes to advertising dollars, I think the record evidence, again, which the Commission did not engage with adequately demonstrates very clearly that both radio and TV are losing out because advertisers view these as substitutable for other digital sources. As a matter of fact, the NERA TV study, which the FCC barely acknowledged, reached that exact same conclusion, as did the Burrell report, which studied predominantly radio, but also… Of course, there's always been competition, Counsel. As late, I think, as 2017, you wouldn't let the main – the FCC prohibited the main newspaper from owning the main TV station for sure. And radio would often beat TV to the scene and have better news than the TV by far, and brighter news and more incisive news and better interviews. So has the competition really changed? I think it has changed and accelerated, Your Honor. I mean, now the person who's going to beat you there may be a civilian person with TikTok on their phone. Twenty of them. Twenty of them. Go ahead. And there's, I think, two points to respond to that, Your Honor. Thank you for raising newspapers. It's on my checklist of things to mention. Because it's true that until 2017, and actually didn't take effect until 2021… It's true. Go ahead. You're right. You know, newspapers could not combine with broadcasters. Who were best situated to buy newspapers, to help them get the resources, perhaps combine newsroom operations and keep them going, would have been broadcasters. But they were prohibited from doing so. We simply think that… That was done through the unemployment office, but proceed. The time to act is far past for broadcasters, so they don't continue down the path that newspapers trod before them. The second point is on localism. You know, TV and radio broadcasters, if they could, would all have newsrooms. The evidence of the record demonstrates that as of now, the economics, for example, in TV, don't support having more than three independent newsrooms in the vast majority of markets. But if they were able to access economies of scale, you know, combine backroom functions, reduce their plant overhead costs, they would have more resources in order to invest in that. And that's what broadcasters do see as a competitive advantage, as you point out, Judge Ben. If they could, you know, get more broadcast news out there, that will better help them compete. The commission's contrary approach basically says, well, look, you know, effectively they're going to die anyway, so let's make sure that there's competition within them on the way down. And that's, I think, a fundamental flaw with how they define the markets. So I think we explained in our briefs that under the commission's logic, broadcasting could keep getting reduced to near minuscule market share. And under the commission's logic, the rules would only become more justified because there would be fewer broadcasters, and it's more important to make sure that they have, you know, are competing with each other. So I think that demonstrates both the statutory flaw in the order, a big one, and that it's irrational under the APA. Is that when you're thinking about this term competition, would the concept of complete competition or a complete substitute, are those relevant at all? Or should those ideas be just discarded? I don't think that complete substitution is required here, Your Honor. And I think it would be incongruous, again, with the purpose and structure of Section 202H, as I think Judge Benton was pointing out. And in any event, there is a lot of record evidence that, again, the FCC did not grapple with, demonstrating that both viewers and listeners, on the one hand, and advertisers on the other, do see these as substitutable in market reality. And I think your everyday experience, the experience of your clerks would demonstrate this. Even though they're not identical? They're not identical, that's true. But, again, that would condemn broadcasters to wither away. And, again, I think the purpose of 202H would be contrary to that purpose, and I do think contrary to the statute. Let me ask you this. Do we have the authority to force the FCC to redefine the marketplace, or is that something Congress has to do? Judge Grunder, I don't think you'd be forcing the FCC to redefine the marketplace. I think that you would be finding that either the statute required the FCC to consider competition outside of broadcasters, or that it was an irrational decision under the APA. And, you know, in light of that, I do think that the appropriate approach here is to vacate the rules. But, historically, they haven't done that. Historically, they've defined the market just to the broadcasters, right? That is true in these quadrennial reviews. They have in the past recognized in the 2017 order that competition was coming in fast and furious from outside, but declined to change their market definition at the time. And to point out, Judge Grunder, that's not necessarily that that was the correct decision then, but also in the last seven, eight years, we've just seen those market changes accelerate. Thank you. Very well. Thank you.  May it please the Court, I'm David Oxenford here on behalf of the Radio Intervenors. Thank you to Mr. Kilberg for setting out the legal premises that govern this case. I'm here to talk about radio, practically about radio, where the need for deregulation is most intense. The FCC's claims for deference, that radio is a separate market, really cannot be credited when you look at the empirical evidence that we provided showing that radio competes every day for both audience and advertisers. The FCC all but ignored empirical detailed studies offered by the NAB and by my clients showing that advertising and audience are going from radio to digital studies not cited by the commission yet year by year. So you represent the small radios, right? Not the big chain radios that are on every station in every market and the Internet and on satellite and everything else. That's correct. And they claim to be radios, I understand, but what they send me, right? That's correct. My clients are local broadcasters that own stations, some of them in several markets, but not the big companies that own stations. So you're saying the FCC has to segment its analysis? No, I don't. I think we're looking at local radio. We're looking at each market, and in each market the competition with digital media is such that advertising and audience is disappearing from local radio and going to digital. Well, you're back to Judge Grunder's question. We have the power to tell them that there are two markets here. There's the, I'm going to use your word, the IHART market, and there's the Sirius market, and there's the local market. Well, no, again, I think we're looking at the local radio market. IHART may own stations all across the country, but in local markets it's competing with digital, with satellite, and with other broadcasters. IHART thinks the commission's right, right? They do. Yeah, and Sirius does too, right? They do. IHART is the largest radio company, the largest in most of the major markets, and seems to be ready to protect its position in those markets. Clients like mine see not only IHART but the digital competitors eating into that marketplace. We see that a third of radio listening has disappeared since 2024. We see that digital competitors, I'm sorry, since 2014. Since 2013, digital giants have taken advertising originally in 2013 at 25% of the local markets. Now it's about 70% of the local market. Advertising is going out of the market to the digital giants. 50% of advertising dollars from every market goes to Google, Facebook, and Amazon. No radio station in any market has a 1% market share. We're competing against digital media companies, and that's what the FCC should have been analyzing, not segmenting radio off into its own world. We've provided evidence from Edison Research, the premier research company, showing competition for radio and audio audiences, showing that there is this constant stream of listeners going from radio to digital. The declaration from the CEO of Edison is not even cited in the record, not even mentioned by the commission in the order. We provided evidence from Burrell and Associates, year-by-year analysis, showing that radio advertising is going to digital, that advertisers view it as a substitute, not even mentioned in the record. We provided declarations from 14 broadcasters, showing that their advertising, specific advertising, is going to digital, not mentioned in the record. What we see is digital giants who can reach everybody in every market with an unlimited choice of programming formats and an unlimited choice of information that they provide, radio stations, and even the biggest markets, those with over 45 stations, in some cases over 100 stations, they can only own eight stations, only five of which are FM. They need to be able to scale, to reach the audience, the entire audience that they're selling. And you would let them combine in any way they want to, right? Correct. Our feeling is that the FCC has not justified the rules as necessary in the face of competition that now exists, and we do define competition in our brief, I believe. Are there no other questions? Thank you very much. Thank you, Mr. Axenford. Good morning, Your Honors. May it please the Court, my name is James Carr, and I represent the Federal Communications Commission. I'd like to start by talking about a question that a couple of the judges raised earlier. What does competition mean in this context? I think it's important to look at the way the statute is written. The Commission has an obligation every four years to take a look at the changes in the marketplace and to determine whether any of its media ownership rules are, quote, necessary in the public interest as the result of competition. So competition has to be judged through the prism of the public interest. Next question, what does the public interest mean here? It's well established that the Commission has, for many years, had three principal public interest goals that its media ownership rules are designed to achieve, competition, localism, and viewpoint diversity. And the Supreme Court just re-articulated those three particular goals in FCC versus Prometheus, but it recognized long ago in the NCCB case back in 1978 that those goals were permissible goals for the FCC to pursue under its public interest mandate under Title III of the Communications Act. So don't think one of your goals is to reduce regulation? That's certainly one possibility, Your Honor, and it depends. Congress said it's a goal for you. It did, but it also said, but it used the term public interest. It gave the Commission the discretion to look every four years and say, okay, the market has changed. What does that mean for our public interest goals? In other words, the key question here is whether competitive changes in the marketplace have created a situation where free market forces alone are sufficient to achieve the public interest goals that the rules were designed to achieve and would do so in the absence of the rules or if the rules were modified in some way and limits were reduced. The Commission looked at that question here and made a determination that at this point, no, the competition that is out there in the marketplace has not changed to such an extent that the rules should be either be eliminated or modified in any way to loosen the limits. And one of the focuses of Petitioner's Brief is all this competition from non-broadcast. And the Commission acknowledged throughout its order that there is plenty of competition coming from these non-broadcast sources. But one critical thing about that competition is that there's not much in the way of local content, particularly local news programming. The broadcasters themselves repeatedly claimed on a number of comments in the record that their local programming on both broadcast radio and broadcast television is unique and unduplicated by any other source. And that's important for the Commission's public interest analysis because it means that in order to promote localism and viewpoint diversity when it comes to local issues, the important thing here is competition from... Mr. Carr, isn't that a little short-sighted in the sense that if the advertising dollars are going to the non-broadcast entities, essentially you're going to force the locals out of business? Well, Your Honor... There won't be any local coverage. I mean, isn't that short-sighted? Your Honor, as I understand their argument, they're basically saying that the Commission needs to change the rules in order to ensure the survival of broadcasting. I think that's their argument. That is their argument, and the Commission responded to that throughout the order. So to the extent there is this argument that the Commission ignored all of these studies that showed that consolidation could benefit local stations, the Commission repeatedly stated throughout the brief, or throughout the order rather, paragraphs 45, 51, 82, 83, all of those paragraphs discuss how the Commission acknowledged that consolidation could help certain local stations to do better. The question becomes, I think one of the judges referred to this earlier, it's not just what's in the private interest of individual broadcasters. It's what's in the public interest. Now, if there were a serious concern that the industry is going to disappear or it's on the verge of failure... Well, there's an AM radio disappearing council. I hear they're not going to put in new cars. Actually, you'd have to talk to Congress about that. Congress is... There is a statute making its way through Congress that would in fact require that it's going to be put in new cars. Because the manufacturers are taking it out. The market is speaking. So is an AM radio dying? Did this order recognize the death of AM radio? I think the order recognized that there are small radio stations, particularly small AM stations, that are struggling. But it also pointed out that in this context, it did not believe that further consolidation was going to be the answer to those small stations' problems. In other words, it wouldn't keep those small independent station owners in the marketplace. And the record contained plenty of evidence, comments from small station owners themselves, who vehemently objected to further consolidation. They told the commission, if you allow looser limits, what's going to happen is the small stations are going to disappear because they're going to be bought out by the big companies that already are at the limit and are looking to buy more stations. So you're going to only make the large station groups larger. You're not going to keep small independent station owners alive in the marketplace. So whatever might be the answer for solving their financial problems, further consolidation is not it. And that's basically what the commission said with respect to radio. Now, go ahead, Your Honor. All I was going to say is when you talked about your goals and throughout most of this, I've not heard you discuss promoting competition, which Congress says you're supposed to do, promote competition. So where does that fit in your goals, the commission's goals, I mean? Well, promoting competition, we look at that goal as interrelated with the other two goals, localism and viewpoint diversity. It was the commission's judgment that it was important to have competition among broadcasters, the only source of local programming, because that was most likely going to be the impetus for local broadcasters to improve their local news programming and their local programming because they're the only ones who are providing it. And you can see that from the local TV stations promote their newscasts all the time. I was in my hotel room in St. Paul yesterday, and the broadcasters will be happy to hear that I was watching a lot of local TV stations. And all of the local TV stations were running ads at different points, promoting their own locally produced program. Because they didn't sell other advertising for that time. Well, no, they still sold plenty of other advertising, but one of them was promoting their locally produced morning show. One of them was promoting their meteorologists who appeared on the morning and evening news. Another one was promoting a locally produced afternoon show that dealt with local and regional issues in the Twin Cities. And the reason they're doing that, they don't have to worry about competing with non-broadcast stations or channels that are not providing local news competition. They're competing with their broadcast rivals in this market. And the commission believed and explained that the reason for trying to keep, keeping the limits in place was to ensure that you had a number of independently owned stations within the market who would be providing local news and competition with each other. So back to Judge Grender's question, it's all a question about how we define the market. Well, it's not entirely about that. Well, you keep saying broadcast market, broadcast market, broadcast market, in fairness. And the thing is, let's say, and the commission acknowledged there was non-broadcast competition. The problem is you take that into account. That does not move the needle with respect to localism and viewpoint diversity, at least viewpoint diversity with respect to local issues, because those sources are not. At some point, though, it has to move the needle. It does, Your Honor. It becomes so overwhelming that you push these other ones out of business. You're not going to have viewpoint diversity and you're not going to have localism. I completely understand that argument, Your Honor. And I think our point is simply this. We haven't reached that point yet. The broadcasters have been making this same argument for the last 20 years. And if we had accepted their argument 20 years ago, it would not have served the public interest. But it seems like the SEC has fought Congress's directive to deregulate. Well, Congress did speak generally about deregulation. No, reduce regulation, counsel. That's not generally. English words, reduce regulation. Yes, Your Honor. But if you look at some of the other English words in the 1996 Act, and I'm very familiar, unfortunately, very familiar with the 1996 Act, there are plenty of provisions in there where Congress is directing the SEC to adopt rules. And there were extensive rules which this Court reviewed back in the late 1990s, much to its dismay. And those rules, again, Congress was basically saying, in order to deregulate, you may have to do some regulation first. So just saying deregulate doesn't tell you the whole story. And Congress could have written this statute differently. It could have set particular competition benchmarks and said, if the market meets these certain conditions, then the SEC is directed to reduce or eliminate. Or if after 10 years, the commission is. What Congress did here, particularly by using the term public interest, was it delegated to the agency, the discretionary authority, to determine whether the rules remained necessary to pursue the commission's public interest goals. And with respect to all the talk about statutory violations, it's important to remember, and the Supreme Court reiterated this in Loper-Bright, the decision that overruled Chevron, that sometimes, quote, the best reading of a statute is that it delegates discretionary authority to an agency. I think Section 202H is best read that way because the Court said elsewhere, this is a 2263 of Loper-Bright, that Congress often empowers an agency, quote, to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility. And it cited the terms appropriate or reasonable. I would argue that public interest is also one of those terms. And the Supreme Court has for decades recognized that the term public interest gives the commission a certain amount of discretion and flexibility in the way it regulates in this area, in broadcasting. Section 202H doesn't change that. And the Prometheus Court, the Supreme Court in Prometheus, recognized this as well. Justice Kavanaugh at the beginning of the opinion acknowledges the FCC still has broad authority under the Communications Act to regulate in the public interest. And if it determines that a regulation is in the public interest, it's free to adopt that regulation. 202H doesn't change any of that. It simply says that every four years, the commission needs to take a look at the competitive marketplace and determine whether competitive changes have rendered particular rules that are on the books no longer necessary in the public interest and reduce regulation. So, counsel, everybody agrees that Note 11 is a tightening of the rule. Everybody agrees it's a burden. Isn't it contrary to the intent to reduce regulation? Because it increases regulation. Well, whatever the intent may be of the legislators, as Justice Gorsuch said in a recent Supreme Court opinion, were governed by the words of the statute. They adopted those words, counsel. Those words are the same as words of a statute. And Congress adopts a preamble. Yes, that's right, Your Honor. The Supreme Court said that many times. Yes, that's right, Your Honor. But if you actually look at the relevant statute here, 202H, it says to — first, the commission has to make a determination whether the rule is in the public interest. And then it is directed to appeal or modify any rule it determines is no longer in the public interest. Now, Congress could have chosen the word loosen or relax instead of modify. It chose modify. I would point the Court's attention to the 1992 decision, Dewey v. Sullivan, where this Court interpreted the term modify in a statute, noticed that it was unqualified, and said, look, normally, in plain everyday language, modify means to change. Could be in either direction. Could be narrowing a rule. Could be broadening a rule. So you adopt the Third Circuit's one-way ratchet rejection. Yes. And I think the Third Circuit — And that doesn't stand. That was — was that the same Prometheus case? Educate me. No. No, it was not, Your Honor. Okay, thank you. It was not. That statutory interpretation, which was adopted about 20 years ago — Uh-huh, yes. — is still good law. And it basically, as the Court explained, what is the commission to do? At the heart of Prometheus is the Third Circuit's been on the wrong track, right? I won't disagree with you there, Your Honor.  But, again, on this issue, occasionally the Third Circuit got some things right. And on this issue, the Third Circuit was correct. The Third Circuit pointed out, what is the commission to do if it determines that a rule is no longer in the public interest because a more restrictive rule is necessary? In that circumstance, is it unable to act under the quadrennial review statute? I also read — there's something incongruous about Petitioner's argument. I read their argument to be that the FCC could not adopt stricter rules in this particular proceeding. I don't think these Petitioners are making the argument that the commission would be unable, in a separate proceeding under its authority, rulemaking authority under Title III of the Communications Act, to make exactly this same change. And given that — Could the commission not do that? I suppose the commission could have done that, but it read the statute, plain language, modify, could mean change in any direction. It said the current version of Note 11 is no longer in the public interest because it allows a certain amount of circumvention of the Top IV Prohibition. To defeat that circumvention, the commission modified the rule to extend it to low-power stations and multicast streams. And that, in the commission's judgment, was an acceptable way to apply 202H. It does seem, in Congress, if Congress really intended to do that, to limit the commission in this proceeding to just moving in one direction, but didn't take away any of the commission's power to adopt more restrictive rules under other parts of the statute, under Title III. It just seems incongruous. And if the commission were to have to roll back this particular modification and could then readopt it in another proceeding outside of quadrennial review, it seems like much ado about nothing, frankly. Counsel, I asked Petitioner's attorney about what the word competition means. Yes. Is that dealt with by the FCC? Well, again, as I said, Your Honor, competition here, to the extent as relevant as determining, and again, we're talking about competition in the media marketplace with respect to broadcasters. And the question is whether that competition affects the commission's pursuit of these other goals, of localism and viewpoint diversity. A few minutes ago, you said that you acknowledge that broadcast stations are in competition with non-broadcast media. Yes, they are. But didn't the FCC find that that's really not the case because they're not a direct, they're not a complete substitute, so therefore there's no competition? They didn't find there was no competition whatsoever, Your Honor. I think what they found was in this context, in order to see whether the competition that is out there is actually enabling the achievement of the localism and viewpoint diversity goals without the rules. And if you look at it in that way, the non-broadcast competition simply doesn't address the situation of localism and viewpoint diversity, at least viewpoint diversity with respect to local issues. I thought competition was an independent, it's one of the three goals. It's one of the three. It's an independent goal in and of itself. It's one of the three, but it is interrelated with the other two, as the Commission explained. The best way in the Commission's judgment to promote localism is to ensure that you have a multiplicity of voices, that you don't have further consolidation in the broadcast markets because the broadcasters are the only ones who are providing this sort of local programming. Let me ask you about the top four prohibition. Yes, Your Honor. Given that the evidence is that there's no longer this gap between four and five, what was the support for retaining the top four prohibition? Well, I think, Your Honor, if you look carefully at the petitioner's evidence about the top four and five, that gap, you'll find that there remains a gap between the top four and the rest of the stations in the top ten markets in the country and in the large majority of the top 50 markets in the country. So what they're really complaining about is the smaller markets. And even there, they don't say, as I read their argument, that most of those markets don't have a gap between the top four and the rest of the stations. They also don't propose that there is any naturally falling gap in any of the markets that would justify a different line. As various courts have explained, when you're analyzing agency line drawing, you have to look at a zone of reasonableness. There is no one line here that would be a precisely right answer because different markets have different conditions. I think the Commission took a reasonable approach here. You still have four major broadcast networks, so that is one reason to have a break at four. Another thing is that the top four stations are most likely the ones who are going to be providing local news. And we talked about that being a predictive judgment. There actually was evidence in the record years ago in, I believe, the first Prometheus decision. So that was back in 2004, that the vast majority of top four stations do in fact provide local news and the vast majority of stations outside the top four do not. So it was reasonable to determine that top four stations are the ones who are going to provide news. That's another reason for not wanting to have further consolidation because you're depriving the market of one more independent owner that is providing local news to the marketplace. Again, this has to be judged in terms of the larger context and it's difficult to derive a single line. That's also why the Commission in 2017 amended its rule to provide for this sort of case-by-case review. And there have been three case-by-case reviews. Is that what the record shows? In the public record. Actually, there have been four that have been granted. Three that were granted within the first year or two year and a half after the rules were in effect and then the Third Circuit vacated those rules. Once they were reestablished, one was granted. There were only two others requested that were withdrawn. I would point out there's also availability for waivers through a different approach. There's a failing station rule. And interestingly, just last week on March 11th, the Court granted a failing station waiver with respect to a top four station consolidation for two stations just down the road here, Rochester, Minnesota, allowing Great Television, which already had a top four station in the marketplace, to buy yet another station. So waivers, case-by-case, it is available. It really hasn't been tried to a great extent yet, but it is available. And the Commission has shown an openness to entertain those requests. If the Court has no further questions, I would ask that the Court affirm the Commission's order in all respects. Thank you very much, Your Honors. Thank you, Mr. Carr. Good morning, Your Honors. May it please the Court. My name is Jessica Ring-Amundson, and I'm arguing on behalf of the interveners in support of respondents, NCTA, the Internet and Television Association, and ATVA, the American Television Alliance. I'm joined today by my co-counsel, Howard Simons. We intervened in support of the Commission's retention of the local television rule for all the reasons that Mr. Carr just set forth. But I would like to focus in particular this morning on one aspect of the record before the Commission that helps to answer some of the questions that the Court has raised, both about the definition of competition and the definition of the marketplace, and that is retransmission consent fees. So retransmission consent fees are the fees that multi-channel video programming distributors, MVPDs, cable and satellite companies, pay to broadcasters to retransmit their content. And when consolidation in a market occurs, broadcasters have increased leverage to charge increased fees. And so what the record shows is that where there are markets where broadcasters are able to consolidate, when an MVPD sits down across the table from the broadcasters, the broadcasters have increased leverage to demand increased fees. Those fees are then passed on to consumers in the form of higher prices. And if, in fact, broadcasting was competing with other video programming, one would expect to see a lot of pressure on retransmission consent fees. In fact, the opposite has occurred. Retransmission consent fees have continued to increase. In fact, they increased by more than 1,000 percent between 2010. Counsel, is there still a must-carry rule? There is still a must-carry rule. Is it a statute or a rule? It's a statute, Your Honor. I thought so. However, the broadcasters offer, and as the Commission found, very popular programming that MVPD consumers expect and demand. And so broadcasters have a lot of leverage because they know when they're negotiating with MVPDs, the MVPDs have to obtain their programming. Or put on their own news and sports, which they're doing more of, right? Which they are doing more of. However, again, if that were actually a competition, and I believe kind of, if I wrote down correctly, the dictionary definition that Judge Shepard raised sort of where you have two or more people vying to obtain business from the same third party. In fact, that's not happening. Broadcasters are still able to command extremely high retransmission consent fees, and those are increasing. So the fact that other programmers are offering their own sports or entertainment, that is not putting pressure, at this point, on the retransmission consent fees that broadcasters are able to command. The fact that broadcasters are able to command these high retransmission consent fees when they consolidate is also a justification for why the commission was correct to adopt a modification to Note 11. So what the record showed was that in an increasing number of markets, broadcasters were circumventing the top four prohibition by obtaining the network affiliation of another broadcaster and then putting it on a multicast stream or low-power television station, which, in effect, gives them the same sort of leverage that they otherwise would be able to obtain if they were able to actually consolidate the two licenses or more. And there were certainly markets where there were not only duopolies, but places where, in fact, a single broadcaster was controlling all four of the major networks in one marketplace. So that also showed that the commission was, back in 2016, when it originally had adopted the prohibition on affiliation swaps, that it was correct then to say, at this point we don't believe that we need to add multicasting and low-power television to this prohibition, but the commission said we're going to continue to monitor the market. The commission did continue to monitor the market. It relied on extensive evidence that was put in mainly by NCTA and ATVA showing that broadcasters were not sort of using this anymore in just short markets, which Your Honor referred to earlier, where there's fewer than four full-power television stations. But, in fact, the markets where there were four full-power television stations or more where broadcasters were employing this circumvention of the top-four prohibition vastly outnumbered the number of short markets. And so we think that as to the questions that Your Honors were asking before about sort of the definition of the marketplace, retransmission consent fees really show why the commission was correct to define the marketplace in the way that it was. Because while broadcasters say, look, MVPDs pay fees to other people for content as well, the point is that, as the commission found, retransmission consent fees provide sort of a unique leverage for broadcasters and a unique source of their revenue. And as the commission also found, this is consistent with how the Department of Justice has treated the marketplace in terms of analyzing anti-competitive effects for purposes of its antitrust analysis, that it also looks at the fact that where consolidation occurs, retransmission consent fees rise. And, again, those fees are passed on to consumers who pay in terms of higher fees. So with that, we would ask the commission or we would ask the court to please affirm the commission's retention of the local television rule if the court has no further questions. Hearing none, thank you. Thank you, Your Honor. Your Honor, the FCC effectively read competition out of the statute and permanently under its logic. As Mr. Carr mentioned, after Loper-Bright, the commission does not get Chevron deference anymore. Yet, remarkably, in the order itself, the commission relies on Chevron deference for its interpretation of Section 202H. And that subsection, 202H, says that the commission shall consider every four years whether to repeal or modify the rules. If they are no longer in the public interest, it shall repeal or modify. I also think that what we heard from Mr. Carr is that when you boil down to it, what the commission is effectively looking at is localism. It's localism in competition. It's localism in viewpoint diversity. It's localism in localism. But the reality is that broadcasters are not just competing among themselves for local content. Yes, they do it very well, and they would do it more, but Judge Benton in Kansas City, the Kansas City Star might not be publishing a print newspaper anymore, but it still has an active web presence. There are independent websites like The Pitch, which bills itself as an independent source of news and content within Kansas City. You have people on TikTok and YouTube creating local videos. The reality is that that market is broader. And yes, the broadcasters would want to produce more local content, but they are constrained from doing so because of the lack of resources that consolidation would allow them to access in order to provide that. In 2004, Mr. Carr referred to a finding 20 years ago with respect to broadcasters not having news operations below the top four. Well, before 2004, the Commission found and the Third Circuit found reasonable that if broadcasters were able to consolidate into common ownership, there would be more resources available and improve local programming. The evidence in the record further demonstrates that, both at the BIA, TV, and radio studies. On radio, I think it is very important to mention that the Commission will search the order in vain for any justification for the numerical limits that the Commission has retained. There is no discussion of that. With respect to AM radio, Judge Benton, the Commission, you know, acknowledged that AM radio is struggling in the order, but then justified retaining the cast because a few stations in some markets are doing well. Both for TV and radio, the Commission has identified issues it says that it's worried about, but it could have addressed those problems directly. Counsel, I wanted to ask this question I've been thinking about, and you can tell me if this is just way not a relevant consideration, but the question is this, does your position work equally as well if we're talking, if we're not talking about the Twin Cities or even Eldorado, Arkansas, but we're talking about the vast areas, rural areas of America that have limited broadband Internet access and that are dependent then solely on over-the-air local broadcast stations? Yes, Your Honor. You know, I think that that could, is, I'm sure, a real problem in certain communities and certain local geographic markets, but the answer to that is not to have an ex ante rule that applies across the country. The Commission could have tried to tailor its rules perhaps to certain circumstances. I also think that the gray case from the 11th Circuit a few weeks ago. How would you tailor it? Because it would seem to me by definition the stations are not in, the stations are not out in the rural area. They're in cities, and so how would you tailor, how could you tailor something? Where the broadcast stations, the local stations, they're serving not only their local communities, the metropolitan areas that they serve or even the towns, smaller towns that they serve, but they're also serving rural areas around those vicinities. Yes, Your Honor. You know, I think that some of these markets are based in particular smaller, I want to say metropolitan areas, but smaller towns. El Dorado being one of those examples combined with the Monroe, Louisiana market. You know, there is an example from your hometown where Channel 10.1, I believe, is NBC. It also broadcasts on the multicast stream on 10.2 Fox. That is a separate station, and it broadcasts it on its multicast in order to reach a broader area of Arkansas. One last thing on that, Your Honor, is that no other media is subject to rules like this. Just broadcasting has these types of ownership limits. If there's anything else, thank you. Thank you, Counsel. The Court appreciates all of you.